UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICK A. YOUNG, | Case No.  C03-5588FDB |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| JOSEPH LEHMAN, *et al.,* | Noted for June 10, 2005 |
| Defendants. | |

This case has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4.  The matter is before the court on defendants' motion for summary judgment (Doc. 59).  After reviewing the motion, plaintiff's response, and the remaining record, the Court should grant defendants' motion for summary judgment.  Plaintiff's causes of action should be dismissed and any pending motions should be denied as being moot.

FACTUAL BACKGROUND

On April 23, 2003, plaintiff, Rick Young, was transferred to Clallam Bay Corrections Center ("CBCC") from Stafford Creek Corrections Center.  Mr. Young remained at CBCC until December 3, 2003, when he was transferred to the Washington State Penitentiary ("WSP").

On the day of his transfer to CBCC and upon arrival at the facility, Mr. Young met with Physicians Assistant (PA) Hayter.  PA Hayter noted that Mr. Young was not cleared for work in the kitchen, and on

REPORT AND RECOMMENDATION
Page - 1

April 24, 2003, PA Hayter issued several Health Service Restrictions ("HSRs")[1] for Mr. Young, including low tier, low bunk, no stairs, no sports, no gym, no weightlifting more than 10 pounds.. Id. Mr. Young's HSRs were set to expire on May 12, 2003, pending a meeting with Dr. Hopfner. PA Hayter noted that Mr. Young requested a second mattress HSR, but found no medical reason for a second mattress. On May 12, 2003, Mr. Young's HSRs were extended until June 11, 2003, as Mr. Young had not yet met with Dr. Hopfner.

On May 20, 2003. Mr. Young filed an initial grievance complaining that he had not received all of the HSRs that he requested, had not been seen by a doctor, and outlining his medical concerns. On May 21, 2003, Mr. Young met with Dr. Edward A. Hopfner. Dr. Hopfner extended Mr. Young's existing HSRs, and added HSRs stating that Mr. Young could use a cane and an electric razor. Dr. Hopfner also ordered a heel lift. Dr. Hopfner did not issue an HSR preventing Mr. Young from working in the kitchen. In the Assignment/Work/School/Athletics section of the HSR, Dr. Hopfner noted three specific restrictions—no heavy lifting, no running, no prolonged standing. Mr. Young requested a second mattress and Dr. Hopfner stated he would discuss it with the health care manager. Mr. Young did not complain about his gym restriction or bring it to Dr. Hopfner's attention in the prepared document. Dr. Hopfner reported that Mr. Young was uncooperative and refused to be examined during this meeting.

On May 22, Mr. Young was placed on the prison's job referral list for Clerk I, Law Library Clerk, and Library Clerk by his counselor.

On June 6, 2003, Mr. Young received the response to his May 20, 2003 grievance, which stated that he had now seen a doctor and that a heel lift had been ordered. On June 9th, Mr. Young appealed his medical conditions grievance to Level II, which was responded to on July 2, 2003, noting that Mr. Young refused medical treatment and that his requests for a second mattress would be discussed at the next Patient Care Committee Meeting.

On July 1, 2003, Mr. Young met with Defendants Gable and Schuler-Sharpes to discuss

---

[1] Health Service Restriction (HSR) are issued by prison health care providers and it allows an inmate to use special equipment or have a special privilege not allowed to other inmates. HSRs may be issued for a variety of privileges, including a cane, shoe lifts, or electric razor, or to indicate allowances, such as work restrictions. Inmates who are classified as "medically unassigned" on their HSR are exempt from normal programming requirements. An HSR is generally issued for a specific length of time. After the specified length of time, the HSR expires and must be renewed. An inmate may request to have an HSR renewed.

REPORT AND RECOMMENDATION
Page - 2

his failure to program, and Mr. Young was subsequently placed on non-programming cell assignment[2].

On July 3, 2003, PA Hayter met with Mr. Young and informed him that he could do some jobs—clerical and light work—and that PA Hayter would not issue a no work HSR for him, despite Mr. Young's request to be relieved of all work obligations. Additionally, PA Hayter indicated that a second mattress was not medically necessary.

On July 23, 2003, Mr. Young appealed his grievance to Level III. In this appeal, Mr. Young raised, for the first time, the issue of his non-programming status and his belief that his legal rights were being violated. Prison officials responded, again indicating that Mr. Young refused to cooperate in medical examinations, which is a necessary prerequisite for obtaining additional HSRs.

On July 30, 2003, Mr. Young was put on the referral list for Teacher's Aid I by Defendant Gable, and on August 5, 2003, Mr. Young met with Dr. Hopfner. Mr. Young asked to the doctor to permit him to be taken off all programming requirements due to his physical condition. Dr. Hopfner did not grant Mr. Young's request, but referred Mr. Young to Dr. Thorson for evaluation and for an assessment of the benefits of physical therapy.

On August 13, Mr. Young met with Dr. Thornson, an Orthopedic Specialist. Mr. Young refused to talk or be examined. Mr. Young presented Dr. Thornson with a legal document reporting medical deficiencies at CBCC. Dr. Thornson's review of the medical record revealed that a primary care provider indicated that Mr. Young was capable of some work on July 3, 2003, and that Mr. Young disagreed with this assessment. Dr. Thornson concluded that if Mr. Young would not submit to medical examination, Dr. Thornson could not provide any useful input on his status.

On October 28, 2003, the Clerk of this court received Mr. Young's complaint. In his complaint, Mr. Young alleges that the Defendants, employees of Clallam Bay Corrections Center (CBCC), violated the American with Disabilities Act (ADA) and Rehabilitation Act of 1973 (RA) by transferring him to CBCC, by denying him Health Status Reports (HSR), by placing him on non-programming status, and by issuing an HSR that prevented him from using the gym. Plaintiff requests declaratory and injunctive relief,

---

[2] Inmates who are not assigned to education or work programming within 45 days after arrival to CBCC are assigned to their cells between 1:00 p.m. and 9:30 p.m. Inmates on cell assignment may go to meals, non-recreation call outs, and once-weekly religious services. Non-programming cell assignment is a management tool to keep control of offenders who are not programming.

REPORT AND RECOMMENDATION
Page - 3

compensatory, actual and punitive damages, and costs and fees.

Having reviewed defendants' motion for summary judgment, plaintiff's opposition to the dispositive motion, and the balance or the record, this court finds (i) Mr. Young has failed to properly exhaust his administrative remedies, (ii) his claims under the ADA and RA are incognizable, (iii) a prisoner does not have a protected right to remain at a certain prison facility, and (iv) defendants' alleged actions were promoted by legitimate penological goals.  Accordingly, the court should grant defendants' motion for summary judgment and dismiss plaintiff's causes of action.

## DISCUSSION

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257.  Mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988)

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (l) the conduct complained of was committed by a person acting under color of state law and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled on other grounds*, Daniels v. Williams, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

A. *PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES*

The Prison Litigation Reform Act at 42 U.S.C. § 1997e(a) states:

> No action shall be brought with respect to prison conditions under section 1979 of the revised Statues of the United States (42 U.S.C. § 1983), or any other federal law, by a prisoner confined in any jail, prison or other correction facility, until such administrative remedies as are available are exhausted.

Interpreting § 1997(e)(a), the United States Supreme Court determined that Congress enacted the

provision in order to reduce the quantity and improve the quality of prisoner suits. Porter v. Nussle, 534 U.S. 516 (2002). By mandating exhaustion, Congress enabled corrections officials to address prisoner complaints internally, often resulting in the correction of administrative problems, the filtering out of frivolous claims, and ultimately a clear record of the controversy. Id. Where exhaustion was once discretionary, it is now mandatory. Id. "All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" Id. (*quoting* Booth v. Churner, 532 U.S. 731, 739 (2001)). The Porter Court ruled that "§ 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences." Porter, 534 U.S. at 520.

In the present case, Plaintiff makes two distinct claims. First, Plaintiff claims that Defendants violated the ADA and RA when they placed him on non-programming status. Second, Plaintiff claims that Defendants violated the ADA and RA by depriving him of access to gym programs. Plaintiff has not exhausted his administrative remedies available to him regarding either claim.

Generally, Washington inmates must utilize the Washington Offender Grievance Program (OGP) prior to filing a lawsuit. This program has been in existence since the early 1980's and was implemented on a department-wide basis in 1985. Under this grievance program, an offender may file a grievance over a wide range of aspects of his/her incarceration, including: 1) Department of Corrections institution policies, rules and procedures; 2) the application of such policies, rules and procedures; 3) the lack of policies, rules or procedures that directly affect the living conditions of the offender; 4) the actions of staff and volunteers; 5) the actions of other offenders; 6) retaliation by staff for filing grievances; and 7) physical plant conditions. Remedies include: 1) restitution of property or funds; 2) correction of records; 3) administrative actions; 4) agreement by department officials to remedy an objectionable condition within a reasonable time; and 5) a change in a local or department policy or procedure.

The grievance procedure consists of four levels of review. At Level 0, or informal level, the offender writes a complaint; the grievance coordinator then pursues informal resolution of the issue, returns the complaint to the offender for additional information, or accepts the complaint and processes it as a formal grievance. At Level I the prison's grievance coordinator responds to the issues raised by the offender. If the offender is not satisfied with the response to his Level I grievance, he may appeal the grievance to Level II. All appeals and initial grievances received at Level II are investigated, and the prison

superintendent responds. If the offender is still not satisfied with the response, he may make a Level III appeal to the Department headquarters, where the issue is reinvestigated and administrators respond. Offenders may not raise new issues at Level II or Level III.

As noted above, Plaintiff filed a grievance on May 20, 2003, complaining that he had not received all of the HSRs that he requested, had not been seen by a doctor, and outlining his medical concerns. The grievance failed to raise the issue of his placement on nonprogramming status. Plaintiff raised this issue by adding it to his grievances about HSRs at Level III.. Plaintiff did not mention his ADA and RA claims, nor any issue concerning his placement on non-programming at the Level I or II of the grievance process.

The Level I and Level II grievances filed by Mr. Young solely addressed the adequacy of the medical care he received, and his complaints about not getting the HSRs he desired. Accordingly, prison officials did not address his non-programming status in the grievance process.

Similarly, Mr. Young never filed a grievance on his restriction from the gym. Mr. Young admits that he never brought his concerns about his gym restriction to the attention of any DOC staff. Therefore, Mr. Young failed to exhaust, or even initiate, his administrative remedies concerning his gym restriction. He is therefore barred from bringing those claims here. All of Mr. Young's claims should be dismissed for failure to exhaust.

*B. AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT OF 1973.*

Title II of the ADA provides that, subject to certain provisions, no qualified individual with a disability shall, by reason of such disability be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. The U.S. Supreme Court determined that the ADA applies in the prison context. <u>Yeskey v. Pennsylvania Dept. of Corrections</u>, 524 U.S. 206, 118 S. Ct. 1952, 1953 (1998).

Title I of the ADA protects against "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. §12112(b)(1). Employment discrimination claims must be brought under Title I of the ADA, as employment claims are not cognizable under Title II. <u>Zimmerman v. Oregon Dept. of Justice</u>, 170 F.3d 1169 (9th Cir. 1999).

A "disability" under the ADA is defined as (1) a physical or mental impairment that substantially limits one or more of major life activities; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). "Impairment" may include any "physiological disorder or condition" that affects one or more body systems, or any mental or psychological disorder. 29 C.F.R. § 1630.2(h). The ADA defines "major life activities" to be caring for oneself, hearing, speaking, breathing, and working. 42 U.S.C. § 12102(2)(A); see also 29 C.F.R. § 1613.702(c). 42 U.S.C. § 12131(2) defines a qualified individual with a disability as follows: [A]n individual with a disability who, with or without reasonable modifications to rules, policies, the removal of architectural barriers, or the provision of auxiliary aids or services, meets the essential eligibility requirements of receipt of services or the participation in programs or activities provided by a public entity.  See also 28 C.F.R. § 35.104.

The applicable regulations, at 29 C.F.R. § 1630.2(j), define "substantially limit[ing]" impairments as:

> Significantly restricting as to the condition, manner and duration under which [a person] can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2 (j). In determining whether a disability "substantially limits" a person from performing a major life activity, courts consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected long term impact of or resulting from the impairment. 29 C.F.R. § 1630(j)(2).

The standards for establishing claims under the ADA and RA are similar and overlapping. To prove that a program or service violates Title II of the ADA, a plaintiff must show: 1) he/she is a qualified individual with a disability; 2) he/she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and 3) such exclusion, denial of benefits, or discrimination was by reason of his/her disability. Weinreich v. Los Angeles County, 114 F.3d 976, 978 (9th Cir. 1997). Under section 504 of the RA, a plaintiff must show: 1) he/she is an individual with a disability; 2) he/she is otherwise qualified to receive the benefit; 3) he/she was denied the benefits of the program solely by reason of his/her disability; and 4) the program receives federal financial assistance. Id.  In either an ADA or RA claim, the plaintiff must demonstrate that the discrimination or denial of benefits occurred because of the plaintiff's disability. Id. The denial of

REPORT AND RECOMMENDATION
Page - 7

benefits, services, or programs to an individual with disabilities does not violate the ADA or RA if the denial is not based on the disabilities of the plaintiff. Id. There is no significant difference between the rights and obligations created by the ADA or RA. Zukle v. Regents of the University of California, 166 F.3d 1041, 1045 n. 11 (9th Cir.1999).

**1. Claims Under Title II Of The ADA May Not Be Brought In A § 1983 Action.**

The Ninth Circuit held that a plaintiff may not use 42 U.S.C. §1983 as a vehicle for bringing a Title II ADA claim or RA claim against a state official in their individual capacity. Vinson v. Thomas, 288 F.3d 1145 (9th Cir. 2002). This holding accords with many other circuit courts. *See* Alsbrook v. City of Maumelle, 184 F.3d 999 (8th Cir. 1999) *cert. dismissed*, 120 S. Ct. 1265 (2000) (remedial scheme of ADA barred §1983 claim); Lollar v. Baker, 196 F.3d 603 (5th Cir. 1999) (§1983 cannot serve as vehicle for RA claim); Holbrook v. City of Alpharetta, 112 F.3d 1522 (11th Cir. 1997) (holding that plaintiff could not file §1983 claim if only deprivation was employee's rights under the ADA and RA). The basis for this conclusion is that §1983 does not confer additional rights, but is a vehicle to bring suit for rights contained in the United States Constitution and defined by federal law. Vinson, 288 F.3d at 1156. As the ADA and RA establish a cause of action against public entities, but not individuals, permitting suit through §1983 would expand the rights granted by the ADA and RA. Id. Similarly, if a statutory right contains a comprehensive remedial scheme for its enforcement, there is a presumption that more general remedies, such as §1983, are foreclosed. Lollar, 196 F.3d at 609 (*citing* Middlesex County Sewerage Auth. V. National Sea Clammers Ass'n., 453 U.S. 1, 20, 101 S. Ct. 2615 (1981)). Therefore, Mr. Young cannot bring his ADA or RA claims through 42 U.S.C. §1983. As Mr. Young's ADA and RA claims are the only claims in his §1983 action, his suit must be dismissed.

**2. Mr. Young Also Cannot Prevail Under Title I Of The ADA.**

Even if Mr. Young's claims are construed under Title I of the ADA, the analysis of Title II in Vinson that prohibited enforcement of the ADA via §1983 would apply equally to Title I. Title I also mandates a well-established remedial scheme for its enforcement, which creates the presumption that general remedies like §1983 are foreclosed. 42 U.S.C. §12117. Additionally, Mr. Young is specifically barred from filing suit by the terms of Title I's well established remedial scheme, as he failed to follow its administrative procedures. 42 U.S.C. §12117.

In order to file suit under Title I, Mr. Young is required to submit his claim to the Equal Employment Opportunity Coalition (EEOC) and upon its review, receive a right to sue letter. *See* 42 U.S.C. §12117 et seq.  Before filing an ADA suit, a plaintiff must timely file a discrimination charge with the EEOC. 42 U.S.C. § 12117(a). Filing a timely charge is a statutory condition that must be satisfied before filing suit in federal court. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).

Mr. Young has not alleged that he filed any claim with the EEOC.  Any Title I claim he might assert is barred.  Finally, the United States Supreme Court held that the United States Congress did not properly abrogate the states' Eleventh Amendment immunity with Title I of the ADA. Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001). As such, Mr. Young is barred from suing the state or its agencies for money damages under Title I of the ADA. Id.

*C. MR. YOUNG FAILS TO STATE A COGNIZABLE CLAIM CONCERNING HIS TRANSFER TO CBCC.*

Mr. Young alleges that Defendant Thatcher violated the ADA and RA by transferring him to CBCC where Mr. Young was placed on non-programming status. Exhibit 6, Attachment A at 48. Mr. Young also alleges that Defendant Thatcher did not transfer him from CBCC. Id. These claims cannot form the basis for any cognizable claim under the ADA.

First, as discussed above, Defendant Thatcher is not a public entity and therefore may not be sued under Title II of the ADA. 42 U.S.C. § 12131. Additionally, Defendant Thatcher's transfer of Mr. Young to CBCC did not deprive him of any programs or activities. Had Mr. Young programmed, either by working or taking classes, he would not have been placed on non-programming status and his access to the programs and activities at CBCC would never have been curtailed. Therefore, Mr. Young fails to state a claim against Defendant Thatcher under the ADA.

Inmates have no constitutional right to be incarcerated in a particular prison. Meachum v. Fano, 427 U.S. 215, 225 (1976). Mr. Young clearly states there are no other claims in this suit other than the ADA and RA.  Nevertheless, the court should note Mr. Young's transfer to CBCC, or the decision to keep him there, does not implicate any constitutional rights, even if Mr. Young are construed liberally to include only a § 1983 claim.  In sum, Mr. Young does not state a claim under the ADA, and has no constitutional right to be housed at a particular prison.

*D. ALL RESTRICTIONS PLACED ON MR. YOUNG WERE RELATED TO LEGITIMATE*

REPORT AND RECOMMENDATION
Page - 9

*PENOLOGICAL INTERESTS.*

Prison regulations are valid if they are reasonably related to a legitimate penological goal, even if the regulation impinges on an inmate's rights. <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987); *see also* <u>Gates v. Rowland</u>, 39 F.3d 1439, 1447 (9th Cir. 1994) (standard set forth in Turner applies to statutory claims such as those under the RA); <u>Love v. Westville Correctional Center</u>, 103 F.3d 558 (7th Cir. 1996) (standard applies to the ADA). Unless an offender can point to an alternative that fully accommodates the offender's rights at de minimis cost to valid penological interests, and show that the prison officials actions are an "'exaggerated response' to prison concerns," a court may conclude that the regulation satisfies the reasonably related standard set forth in <u>Turner</u>, 482 U.S. at 90-91. The burden is on the inmate to show that a prison regulation is unreasonable under <u>Turner</u>. <u>Gates</u>, 39 F.3d at 1447.

As discussed above, Mr. Young's rights under the ADA and RA were not violated at CBCC. However, even if Mr. Young could demonstrate that there was an infringement on his rights, all of the regulations relied on by prison officials were reasonably related to legitimate penological interests.

The applicable regulations are reasonable. Assignment to non-programming status is a management tool to keep track of inmates who are not assigned to other placements. Permitting inmates to freely roam during assignment hours increases management problems, and results in an increase in general and serious infractions. Similarly, assignment to non-programming status is not based on one's ability to work. The policy is applied to disabled and non-disabled inmates alike solely on the basis of whether they are working or not. Mr. Young admits that the Defendants "applied the same policy against Plaintiff that is applied against non-disabled inmates." Complaint at 5. Prison officials have a legitimate interest in controlling the movement of offenders within the prison and to know where an offender is at all times. The prison regulations are reasonable and valid, and therefore do not establish a cause of action for Mr. Young.

## CONCLUSION

Based on the foregoing discussion, the Court should grant defendants' motion for summary judgment and dismiss plaintiff's complaints and causes of action. Plaintiff's pending motions, if any, should be denied as being moot.

REPORT AND RECOMMENDATION
Page - 10

     Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **June 10, 2005**, as noted in the caption.

     DATED this 13th day of May, 2005.

                                        */s/ J. Kelley Arnold*
                                        J. Kelley Arnold
                                        U.S. Magistrate Judge